YELVINGTON *v.* OVERSTREET.

4-5486                                    129 S. W. 2d 231

Opinion delivered June 5, 1939.

*A. R. Cheatham* and *Walter L. Brown,* for appellant.

*Ezra Garner,* for appellee.

HUMPHREYS, J.   Appellants were the owners by inheritance from their father of an eighty-acre tract of land in Columbia county, described as follows:

SW¼ of SE¼ and SE¼ of SW¼, section 19, township 18 south, range 20 west, containing 80 acres, more or less.

J. C. Yelvington resided upon the land. The Yelvingtons gave two mortgages upon it, one to Beene Motor Company and later another to Charles Lewis.

Both mortgages were foreclosed and C. A. Overstreet paid the amount due on each and S. G. Yelvington directed the Commissioner to make the deeds to C. A. Overstreet. The consideration expressed in the commissioner's deed under the Beene Motor Company mortgage was $801.16 and that expressed in the commissioner's deed under the Charles Lewis foreclosure was $126.75.

C. A. Overstreet paid the amount of both judgments and W. E. Williamson, who was the commissioner, executed deeds to C. A. Overstreet on January 28, 1935, and two days later S. G. Yelvington and Eunice Yelvington, his wife, executed a quitclaim deed to C. A. Overstreet because Eunice had not joined in the original mortgage to Beene Motor Company.

On March 15, 1935, C. A. Overstreet and wife executed a deed to Bonnie Davis.

On April 10, 1938, appellants brought suit in the first division of the chancery court of Columbia county against appellees alleging that the commissioner's deed and the quitclaim deed were in fact a mortgage, though in form deeds, because executed under an agreement that appellants could, within twelve months, pay to C. A. Overstreet the amount he had paid in satisfaction of the foreclosure decrees with interest and costs and receive from him a quitclaim deed to the lands; that Bonnie Davis was a party to the agreement; that within the twelve-month period allowed to them for redemption they tendered the full amount due C. A. Overstreet, which he refused to take, stating that he had already quitclaimed the lands to Bonnie Davis, whereupon they tendered the full amount, interest and costs to Bonnie Davis before the expiration of the twelve-month period, which he refused to accept and reconvey the lands to appellants.

The prayer of the complaint was that upon payment of the amount of money, interest and costs tendered by them that the commissioner's deeds and quitclaim deed from C. A. Overstreet to Bonnie Davis be canceled and that appellants be declared the owners of the land.

Appellees filed an answer admitting that C. A. Overstreet purchased the lands at the commissioner's

sale and later obtained a quitclaim deed from S. G. Yelvington and Eunice Yelvington, his wife, conveying their interest in the land to him, but stated that the quitclaim deed was executed for the purpose of conveying the title of Eunice Yelvington, wife of S. G. Yelvington, because she had not signed the original deed of trust or mortgage given to the Beene Motor Company by the Yelvingtons.

Appellees denied that the commissioner's deed and quitclaim deed were in truth and in fact a mortgage and denied that the deeds were intended to be or considered as a mortgage. They also denied that there was an understanding or express agreement that appellants could pay the purchase price, interest and costs to C. A. Overstreet or his assignee and receive a reconveyance of the lands from appellees. They also denied that appellants or either of them ever tendered any money to redeem the lands or that appellants had any equity of redemption in same.

The prayer in the answer was for a dismissal of appellants' complaint for the want of equity and that the title to the lands be quieted and confirmed in appellee, Bonnie Davis. The cause was submitted to the court upon the pleadings and evidence introduced by the respective parties resulting in a dismissal of appellants' complaint for want of equity, from which is this appeal.

S. G. Yelvington testified, in substance, that before the land was sold under the mortgage foreclosures he went to see Mr. Bonnie Davis about it and asked him whether he could get a loan; that Mr. Davis was connected with the Federal Land Bank and was told by Mr. Davis to buy the land in and he thought he could get somebody to take it up; that on the day of the sale he again went to see Mr. Davis and told him they were going to sell the old home place; that Mr. Davis told him again to go ahead and buy it in and go to Mr. Overstreet and he would furnish the money; that he bought it in and later saw Mr. Overstreet in the circuit clerk's office and that Mr. Overstreet asked him whether he, witness, wanted to see him; that prior to that interview he had never talked to Mr. Overstreet about the matter; that Mr. Overstreet said if they have sold your place I will

furnish you the money to pay it off; all he wanted was his money back and the interest on it; that from the conversation he was under the impression that Mr. Overstreet would allow him twelve months to redeem the land and said to me that I could pay him back any time I got ready; that all he wanted was his money back with interest; that he then went to Mr. Henry Stevens' office where Mr. Overstreet told Mr. Stevens that he was going to take this up and help the boys take care of their old place; that Mr. Stevens fixed up the papers and that the Commissioner deeded the property directly to Mr. Overstreet and that two days later he and his wife executed a quitclaim deed to Mr. Overstreet to perfect the title, but that he did not intend the deed to be an outright conveyance to him; that on the 13th day of January, 1936, he and his brother went out to see Mr. Overstreet and offered to pay him the money back with interest and requested that he make appellants a deed to the property and Mr. Overstreet told him that he had already sold it to Bonnie Davis; that a man by the name of Miller was with him who had agreed to furnish the money to pay Mr. Overstreet; that no money was actually tendered; that he then sent his brother to Mr. Bonnie Davis.

J. C. Yelvington testified, in substance, that he had a conversation with Mr. Overstreet on March 20, 1935, and told him that if he wanted his money we would get it for him and that Mr. Overstreet told him that he was under obligations to S. G. Yelvington to let him take it over, but that if my brother did not take it up he was under no obligation to let him, witness, do so. Witness further stated that he went to Bonnie Davis and offered to pay the amount and asked for the land back and that Bonnie Davis told him that he did not buy it to sell; that after the mortgage sale he remained upon the land and did some work on the place and had a flue built sometime in June, 1935; that no money was tendered by appellants to either C. A. Overstreet or Bonnie Davis, but that they offered to make him a check which was good; that Bonnie Davis did not make any demand for the property during the year 1935, but that the day after they

offered to redeem the land he was served with a writ of assistance by the sheriff and removed from the property.

Sam Emerson testified, in substance, that he and J. C. Yelvington were to cultivate the land in 1935, but that Yelvington failed to furnish him; that when he applied to Bonnie Davis to make some small improvements on the property, Davis told him that he did not want to make any improvements until the time was up for the Yelvingtons to redeem it, but would let him have some lumber that was already at Davis' home to build him a cow pen and a shed; that his contract was with S. G. Yelvington and Overstreet to whom he agreed to pay one-third and one-fourth as rent.

Maxwell Miller testified, in substance, that he went with appellants to see Overstreet and offered to pay him the money, interest and costs to redeem the land and was told by Overstreet that he did not own the property, that the title had passed from him.

Henry Stevens testified, in substance, that he represented the original mortgagees in the foreclosure proceedings and that during the afternoon and before the sale S. G. Yelvington told him that he would make arrangements whereby he would get up the money to buy the property and that S. G. Yelvington would buy it in in the afternoon when it was sold; that S. G. Yelvington told him he had a year in which to redeem the property; that sometime later the witness approached C. A. Overstreet and informed him that the Yelvingtons were ready to pay them his money, but that Mr. Overstreet did not have much to say about it; that he did finally say that he could not make them a deed, that he had disposed of the land.

C. A. Overstreet testified, in substance, that after the sale as he was passing through the courthouse, someone told him that S. G. Yelvington wanted to see him: that S. G. Yelvington came to the clerk's office and asked him to put up the money, the amount he had bid the property in for, stating to witness that he would give him a mortgage on the land as security; that he told Yelvington that he was not interested and that he did not want to tie up his money for a year; that Yelvington then

told him that he could have the land at his bid and that they went to Mr. Stevens' office and was advised that the matter could be worked out without the necessity of reselling the property and that upon that statement of Mr. Stevens' he paid the entire amount due under the two mortgages to the clerk of the court; that on March 20, 1935, J. C. Yelvington came to see him about redeeming the property; that he had used his own money in satisfying the mortgage decrees, but that he had no recollection of what occurred; that when the Yelvingtons and Miller came to see him about redeeming the land in December he had already conveyed the land to Bonnie Davis; that he paid his own money for the land when he obtained his Commissioner's deeds and no part of it belonged to Bonnie Davis; that Bonnie Davis had spoken to him before the sale saying that if he, Overstreet, could buy the property in at the foreclosure sale he would see that he lost nothing on the deal; that he did not want somebody to buy it who would put objectionable people on it; that he had no conversation with the Yelvingtons before the sale and no agreement with them or either of them to allow them a year to redeem it when he obtained the Commissioner's deeds and quitclaim deed from J. C. Yelvington and his wife.

Bonnie Davis testified that he made no agreement with the Yelvingtons that he would procure the money for them to buy the land in at the mortgage sale and would see that they might have a year to redeem same; that when J. C. Yelvington came to him something like a year after the property was sold and asked about redeeming the land he told him that he did not care to sell the land and that he never had any further discussion with him; that he did tell S. G. Yelvington to go see Overstreet, but that Yelvington came back to him and said that Overstreet would not have anything to do with purchasing it and in extending them the right to redeem same.

All the instruments including the original mortgages, the report of sale by the Commissioner and the confirmation thereof by the court, the two Commissioner's deeds and the quitclaim deed from S. G. Yelvington

and Eunice, his wife, and the deed from Overstreet to Davis were introduced in evidence.

Neither the Commissioner's deeds nor the deed from S. G. Yelvington and Eunice, his wife, to Overstreet, nor the deed from Overstreet to Bonnie Davis, contained any clause which would indicate that the Yelvingtons had a right to redeem the land within twelve months on or after the execution of the deed S. G. Yelvington says that the deed was delivered with that understanding, but Overstreet testified that there was no such understanding. J. C. Yelvington moved away from the place after the writ of assistance was served on him and this suit to redeem was not instituted until more than two years after the offer to redeem and the refusal on the part of appellees to reconvey the property to appellants. While not perhaps estopped from bringing suit on account of this delay as the situation of the parties was not changed, yet it is a strong circumstance to indicate that they did not have a contract for the redemption of the land which they regarded as binding upon the appellees. The law is that where it is sought to show that a deed absolute in form was intended to be a mortgage, the burden rests upon the one who alleges that it was intended as a mortgage to show by clear, unequivocal and convincing evidence that the instrument was intended to be a mortgage and not a deed. *Bailey* v. *Frank,* 170 Ark. 610, 280 S. W. 663. We are quite certain that if Davis or Overstreet were attempting to foreclose the commissioner's deeds and the quitclaim deed as a mortgage and to obtain a judgment against the Yelvingtons for the amount Overstreet paid when the Commissioner's deeds and the quitclaim deed were executed they could not do so, and, if they could not do so the evidence is insufficient to show under the rule stated above that the instruments were intended as a mortgage. S. G. Yelvington testified that Overstreet agreed to let him pay the amount Overstreet was out and deed him the property within twelve months, but when pressed on cross-examination he said that that was the impression Overstreet made on him at the time of the execution of the instruments. Overstreet denied absolutely that any right of redemption was reserved by the

Yelvingtons and stated that he refused to pay anything on the judgments if the right to redeem was reserved by the Yelvingtons. He testified that S. G. Yelvington made two propositions to him of that kind and that he would have nothing to do with it until Yelvington turned to him and told him to go ahead and take the property for the bids he had made at the foreclosure sales. We do not think that the evidence is of that certain, unequivocal and convincing character that would authorize or justify a court of equity to treat the instruments as a mortgage instead of deeds.

No error appearing, the decree is affirmed.